**United States District Court**
**District of Colorado**

Civil Action No. 12-cv-01306-REB-KLM

SALBA CORP, N.A., a Canadian corporation
SALBA SMART NATURALS PRODUCTS, a Colorado limited liability company,
WILLIAM A. RALSTON, and
RICHARD L. RALSTON,
    Plaintiffs,

v.

X FACTOR HOLDINGS, LLC, a Florida limited liability company, and
ANCIENT NATURALS, LLC, a Florida limited liability company,
    Defendants.

---

### DEFENDANTS' MOTION AND MEMORANDUM TO ENFORCE SETTLEMENT AGREEMENT

X Factor Holdings, LLC and Ancient Naturals, LLC ("Defendants"), through their attorney Thomas P. Howard, move this Court to enforce the March 7, 2013 settlement agreement ("Agreement"). In support of this motion, Defendants offer the following memorandum.

### I.    INTRODUCTION

Plaintiffs have failed to honor the unambiguous Settlement Agreement executed on March 7, 2013. Under the Agreement, Plaintiffs agreed to purchase certain intellectual property rights from Defendants/Counterclaimants for $135,000. Defendants satisfied their obligations in full under the Agreement by transferring valuable intellectual property rights to Plaintiffs. The Agreement required Plaintiffs, by October 5, 2013, to record the transfers, dismiss the case, and release to Defendants a final $70,000 payment.

Instead, after gaining control of the Defendants' valuable intellectual property, Plaintiffs failed to record the transfers, dismiss the lawsuit and release the final $70,000 payment. They now raise factually and legally unsupported claims against Defendants. Their claims are a red herring intended to conceal their failure to pay the final settlement payment, retain Defendants' intellectual property without payment of due compensation, frustrate legitimate competition, and put a competitor out of business. Plaintiffs' have knowingly breached the Settlement Agreement and are causing direct and ongoing injury to Defendants.

Defendants respectfully request this Court to enforce the Settlement Agreement as written; dismiss the case with prejudice; require Plaintiffs to pay the $70,000 owed to Defendants for the intellectual properties they have obtained, and require Plaintiffs to pay all legal fees and costs resulting from their intentional and ongoing breach.

## II.   STATEMENT OF FACTS

**A. The parties agreed to a trademark assignment, a transfer of multiple domains, a copyright license, and a $135,000 payment to the Defendants in exchange for the above**

The parties are direct competitors in the market for *Salvia hispanica L.*, commonly known as Chia seeds. This suit arises from the use of a group of "Salba" trademarks, domains, and copyrights that Defendants had used, pursuant to license, to sell *Salvia Hispanica* since 2005. On March 7, 2013, the parties entered into a Settlement Agreement ("Agreement"). Exhibit A. Pursuant to the Agreement, Defendants agreed to:

> 1. assign to Plaintiffs all "Salba" trademarks owned or controlled by Defendants;

2

    2. transfer to Plaintiffs all relevant "Salba" domains owned or controlled by Defendants;

    3. provide a non-exclusive license to Plaintiffs with regards to all relevant copyrighted works owned or controlled by Defendants that incorporate the word "Salba".

Plaintiffs agreed to pay $135,000 to the Defendants for the assignment of their Salba trademarks, the transfer of their Salba domains and the non-exclusive licensing of their copyrights incorporating the word "Salba".  The purpose of the Agreement is to resolve all pending litigation and to avoid future litigation.

The $135,000 was placed in escrow with counsel for Defendants.  Plaintiffs were required to release the first payment of $65,000 from trust to Defendants upon execution of the Trademark Assignment and Copyright License ("Assignment and License") and related documents.  In reliance on the Settlement Agreement, Defendants executed the Assignment and License on March 20, 2013.  Exhibit B.  The Assignment and License gave Plaintiffs all the rights they bargained for in the Settlement Agreement.  The final $70,000 payment was to be released from trust upon Plaintiffs recording the trademark transfers with the appropriate trademark offices and dismissing the case.  Plaintiffs were to record the transfers, dismiss the case, and release the final payment by July 5, 2013.

On March 7, 2013, upon execution of the Agreement, the parties filed a Stipulated Motion to Stay Litigation in which they jointly stated that the matter is <u>fully settled</u>.  Exhibit C [Doc. #33].  The Stipulation confirms that, "[a]t the end of the one hundred and twenty (120) day stay, the Parties <u>will file a Stipulated Dismissal involving</u>

<u>all Parties, which will bring this matter to a close</u>." Doc. #33 (Emphasis added). A copy of the Stipulated Motion to Stay Litigation is incorporated in the Agreement. The March 18, 2013 Minute Order which grants the stay states as follows: "IT IS FURTHER **ORDERED** that dismissal papers are due **on or before July 12, 2013**. Doc # 35; (emphasis in original).

Subsequent to executing the Agreement, Defendants ceased using their SALBA marks or any SALBA-formative marks. On their product labels, they replaced the SALBA mark with the generic term "Salvia Hispanica." Exhibit D. *Salvia hispanica L.*, commonly known as "Chia," is a type of flowering plant of the genus *Salvia* in the mint family native to Mexico and Guatemala. The word has been in existence for almost 300 years and is expressly recognized by the U.S. Patent and Trademark Office as a generic term. Exhibits E, F. The word "Salba" does not appear on any of Defendants' current packaging, labels or promotional materials. As required by the Agreement, the Defendants executed declarations confirming the cessation of use of the SALBA marks.

**B. Plaintiffs, in breach of the Settlement Agreement, failed to release the final settlement payment to the Defendants**

In late June 2013, the Plaintiffs informed the Defendants that they would not be able to record the trademark transfers by July 5, 2013, the date jointly stated in the Stipulated Motion to Stay Litigation. Plaintiffs assured Defendants that they would complete all trademark transfers and record them by October 5, 2013. The Defendants, assuming the Plaintiffs were acting in good faith, agreed to Plaintiffs' request for three additional months. This delay postponed the dismissal of the lawsuit and the release from trust of the final $70,000 payment owed to Defendants.

4

On July 2, 2013, the jointly parties moved the Court to extend the stay and the dismissal by three months, until October 5, 2013. Doc. #36. In that motion, the parties stated that "on or before October 5, 2013, the Parties will file a Stipulated Dismissal involving all Parties, which will bring this matter to a close." In response to that stipulation signed by the parties, the Court ordered "on or before October 5, 2013, the parties **SHALL FILE** their anticipated joint stipulated motion to dismiss this case based on their settlement agreement." Exhibit G. [Doc. #37] (Emphasis in original). Upon dismissal of this case, the final $70,000 payment was to be released from trust to the Defendants.

Pursuant to the Agreement, Plaintiffs agreed to conduct due diligence to ensure the completion of the transfers and to advise counsel for Defendants as to the status of the pending transfers on a monthly basis. Exhibit A. Contrary to the terms of the Agreement, Plaintiffs failed to advise Defendants as to the status of the pending trademark transfers. On September 5, 2013, 30 days before the Stipulated Dismissal was to be filed and in violation of the same, Plaintiffs alleged via email that that they needed an additional *18 months* to finalize their trademark transfers. On that same day, Plaintiffs file a Motion to Lift Stay. That Motion was denied as moot, as Plaintiffs failed to dismiss this case with prejudice by October 5, 2013, in direct violation of the parties' July 2, 2013 stipulation and this Court's July 22, 2013 Order. Exhibit G. As a result of Plaintiffs' multiple breaches of the Agreement and violation of this Court's Order, this matter has never been released with prejudice and the final $70,000 payment has never been released, thereby causing ongoing injury to Defendants.

As a result of Plaintiffs' multiple and ongoing breaches and misrepresentations, upon which Defendants have relied to their severe detriment, this case was not dismissed on or before October 5, 2013. Defendants did not receive, and have not received, the second payment of $70,000 that they were to be paid in exchange for the intellectual properties that they assigned, transferred and licensed to Plaintiffs. Defendants have suffered and are suffering severe and ongoing financial injury.

### III.   LEGAL ARGUMENT
#### A. The Trial Court Has the Power to Enforce Settlement Agreements

A trial court has the power to enforce settlement agreements entered into by the litigants while the litigation is pending before it. *United States v. Hardage*, 982 F.2d 1491, 1496-97 (10th Cir. 1993). The law favors compromise and settlement, and settlements will be enforced by the court. *Citywide Bank of Denver v. Herman*, 978 F.Supp. 966, 977 (D.Colo. 1997); *City and County of Denver v. Adolph Coors Co.*, 813 F.Supp. 1476, 1479 (D.Colo. 1993).

State contract law applies to issues involving the formation, construction, and enforcement of a settlement agreement. *United States v. McCall*, 235 F.3d 1211, 1215 (10th Cir. 2000). The construction of a contract is a question of law for the court. *Florom v. Elliott Mfg.*, 867 F.2d 570, 575 (10th Cir. 1989). To be enforceable, the terms of a settlement agreement must be clear, unambiguous, and capable of enforcement. *Adolph Coors*, 813 F.Supp. at 1479. "Unless the words used by the parties to express their agreement are found to be ambiguous in some material respect, the court should give them legal effect according to their plain, ordinary and popular meaning." *Florom* at 575.

Once a settlement has been authorized, a party cannot avoid the terms of the settlement simply because they have changed their mind. *Woods v. Denver Dept. of Revenue*, 45 F.3d 377, 378 (10th Cir. 1995). Nor can a contract be rescinded or avoided because one party made a unilateral mistake concerning a contract term. *In re Marriage of Manzo*, 659 P.2d 669, 672 (Colo .1983). Only a *mutual* mistake can void a contract. *Royal v. Colorado State Pers. Bd.*, 690 P.2d 253, 255 (Colo. Ct. App. 1984).

Notwithstanding that, "[a]ll agreements have some degree of indefiniteness and some degree of uncertainty.… [P]eople must be held to the promises they make." 1 Corbin on Contracts (Perillo Rev. Ed.1993) 530, §4.1. Under Colorado law, the court's primary goal is to determine and give effect to the intent of the contracting parties. *Ad Two, Inc. v. City & Cnty. of Denver ex rel. Manager of Aviation*, 9 P.3d 373, 376 (Colo. 2000). The principal evidence of the party's intent is the language of agreement itself. *Id*. Agreements that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language. *Id*; *USI Properties E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997) ("courts should not rewrite the provisions of an unambiguous document, but must enforce an unambiguous contract in accordance with the plain and ordinary meaning of its terms.").

**1.    Having Satisfied the Unambiguous Terms of the Settlement Agreement, Defendants are Entitled to Full Compensation for their Assigned, Transferred Licensed Property and Dismissal of This Lawsuit With Prejudice**

The language of the Agreement is clear and unambiguous. The Court should give the Agreement legal effect according to its plain meaning. *Florom v. Elliott Mfg.*, 867 F.2d 570, 575 (10th Cir.1989). The language of the Agreement is the product of

7

careful review and drafting by counsel for both sides. Counsel exchanged numerous emails and phone calls discussing the provisions and language to be included in the Agreement, as well as the time necessary to record the trademark transfers.

The Agreement and the incorporated March 7, 2013 Stipulated Motion to Stay make it plain that (1) the entire case was settled; (2) it was to be dismissed by July 5, 2013; and (3) the final payment was to be released at the time of dismissal. Exhibits A, C. Paragraph 1(C) of the Agreement describes the process for terminating the case and releasing the final settlement payment. Upon recording the foreign "Salba" trademark transfers, Plaintiffs' counsel was to notify the parties by letter of the recording. Plaintiffs stated they expected they could record the transfers by July 5. The parties would then file the Stipulated Dismissal; the Court would issue an order approving the dismissal; and Plaintiffs would release the final $70,000 settlement payment to Defendants.

The 120-day payment plan was an essential element of the Settlement Agreement. In reliance on the same, upon signing the Agreement Defendants immediately assigned their Salba trademarks, transferred their Salba domains and licensed their Salba copyrights to Plaintiffs. They so acted based on the Plaintiffs' contractual representation that, within 120 days of settling, Plaintiffs would dismiss the case per the Court's Order and fully compensate Defendants for those assignments, transfers and licenses. Based on the same, Defendants expected to have their final $70,000 settlement payment no later than July 5, 2013.

However, in late June, Plaintiffs' notified Defendants that they allegedly could not record the transfers by July 5, 2013 and required an additional three months, until October 5, 2013. Defendants, believing Plaintiff's and acting in good faith, on July 2, 2013 stipulated to a three-month extension. However, Defendants required that the stipulation state that "on or before October 5, 2013, the Parties <u>will</u> file a Stipulated Dismissal involving all Parties, which will bring this matter to a close." Exhibit G. Despite the clear terms of that July 2, 2013 stipulation, Plaintiffs failed to file that dismissal. As a result of Plaintiffs' actions, Defendants have not received the $70,000 which they are owed by Plaintiffs pursuant to the Agreement.

Plaintiffs must honor the Agreement, dismiss the case, and release the final payment. Plaintiffs' failure to dismiss the case by October 5, 2013, as stipulated, constitutes a direct breach of the Agreement.

### 1. The Defendants satisfied all obligations under the Settlement Agreement

The Defendants have promptly satisfied all of their obligations under the Agreement. Less than two weeks after the Agreement was signed, the Defendants executed the trademark assignment and copyright license attached as Exhibit B to the Agreement. Defendants also transferred all the "Salba" domains to Plaintiffs and delivered to Plaintiffs or destroyed all documents which reflected any SALBA mark or SALBA-formative mark.

The Defendants diligently executed all documents requested for recording the transfers of the marks. The Defendants promptly executed and returned all of the recording documents requested by Plaintiffs' Counsel. Plaintiffs' counsels' own

timeline, dated September 5, 2013, shows that Defendants—located in Florida—executed and returned the requested documents through Colorado counsel within a week. Exhibit H. Moreover, Defendants will continue to promptly execute and return any documents needed to record transfers, as they are under ongoing obligations to facilitate the recording of the foreign trademarks. Exhibit A, ¶14(A) and Exhibit B, ¶1(B).

### 2. Plaintiffs Have No Exclusive Copyright With Regards to Defendants' Labeling Designs

Defendants created and refined their package label in late 2006 and early 2007. Plaintiffs were so impressed with the label, that in 2008 they asked Defendants to create labels for Plaintiffs' chips, puffs, and salsa. Exhibit I. Plaintiffs' 2008 package design is a direct derivative of the Defendants' copyrighted design. 17 USC §106.

In the Agreement, Plaintiffs requested that Defendants granted a *non-exclusive license* to use the Defendants' copyrights. The language of the Assignment and License is unambiguous. Although Defendants agreed to *assign* all the Salba trademarks owned or controlled by Defendants, they only *licensed* the "copyrights associated with documents, illustrations, labels, photographs, representations or other forms of use of the word SALBA including website content…" Exhibit B, Recitals (emphasis added). A non-exclusive license, unlike an assignment, does not transfer ownership. The license merely gave Plaintiffs the non-exclusive right to use Defendants' copyrighted works, including the product label. The parties deliberately choose a license over an assignment to ensure that Defendants retained their right to use their *own* copyrighted works, including the labels.

The specific language of the license section of the Assignment and License is unambiguous. The Court should give it legal effect according to its plain meaning. *Florom v. Elliott Mfg.*, 867 F.2d 570, 575 (10th Cir.1989). Paragraph 2(A) states, "Transferor [Defendants] hereby grants to Transferee [Plaintiffs] an irrevocable, unrestricted, worldwide, perpetual, royalty free, fully assignable, fully transferable right and license to use, modify, reproduce, distribute, display, perform, publish, sell, prepare derivative works of, and otherwise utilize and exploit ("Use") the SALBA Works."[1] Exhibit B ¶2(B). This is the entire license grant. The license section goes on to state that Defendants are the sole owners "of all right, title and interest, including, without limitation, all copyrights in the SALBA Works." Exhibit B ¶2.

The license is not the product of carelessness or inattention. It is intended to shield Plaintiffs from future claims of infringement by Defendants, while allowing Defendants to continue to own and use the copyrights. Any claim that the Defendants do not have the right to use their own copyrighted labels is completely without legal foundation. Construing the license or the Agreement as grounds for prohibiting Defendants from using their *own* original labels twists the language and intent of the Agreement beyond recognition.

---

[1] The term "SALBA Works" is defined in the recitals of the License and Assignment. "WHEREAS, Transferor is also the owner of all right, title and interest in and to materials containing the word SALBA or any derivative or form thereof, including, without limitation, all copyrights associated with documents, illustrations, labels, photographs, representations or other forms of use of the word SALBA including website content hosted as of the date that the Settlement Agreement is signed at the salba.com, salbausa.com, salbastore.com, salbarx.com or salbamiracle.com domains to which Transferor claims or may claim any copyright under United States federal law, state law, common law, or the law of any foreign country (the "SALBA Works")."

Had the parties intended to assign the SALBA Works, they would have used the language they used in the trademark assignment and not used the word "license." Plaintiffs' current efforts to use this non-exclusive license as a sword to attack Defendants' use of their own labels is the product of bad faith.

If Plaintiffs want the exclusive right to use Defendants' label, they should have negotiated and paid for an exclusive copyright license or an assignment. Whether this failing is the result of a unilateral mistake or simply because they have changed their minds, they cannot rescind or avoid their obligations under the Agreement by making frivolous, unsupported legal arguments. *Woods* 45 F.3d at 378; *In re Marriage of Manzo*, 659 P.2d at 672; *Royal*, 690 P.2d at 255.

Plaintiffs' attempt to rewrite the terms of the Agreement to take *exclusive* control of Defendants' copyrighted label is unlawful and contrary to the unambiguous language of the Agreement and the Assignment and License. It is an anti-competitive effort to delay or extinguish a legitimate competitor. The license grant is not ambiguous; it does not use the word "exclusive" and it should not be rewritten to include the word "exclusive." *USI Properties E., Inc.* 938 P.2d at 173. The Agreement should be enforced as written and cannot be used to prevent the Defendants from using their own copyrighted label.

## B. Defendants' are entitled to use the generic term "Salvia Hispanica" to describe their product

Defendants use the term "Salvia Hispanica"—the generic scientific name for Chia—on their label to inform consumers of the contents of the bottle. As detailed

below, the term "Salvia Hispanica" does not and cannot function as a mark. It cannot cause confusion with a trademark.

Generic terms can *never* function as marks; they can never be protected as trademarks. *Miller Brewing Co. v. Falstaff Corp.,* 655 F.2d 5, 8 (1st Cir.1981); *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir.1975) ("[T]o allow trademark protection for generic terms, *i.e.,* names which describe the genus of goods being sold . . . would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are."). The United States Patent and Trademark Office has expressly determined the words "Chia" and "Salvia"[2] are generic. Exhibits E, F. For this reason, dozens of vendors use "Salvia Hispanica" to describe their products. Exhibit J. If Plaintiffs could bar any of the many venders of Chia, including but not limited to Defendants, from using "Salvia Hispanica" to describe this product, they would be at a significant and unfair competitive disadvantage. It would be precisely like telling sellers of "milk" or "bread" that they cannot use those generic names of products to describe their products.

Defendants retain the fundamental right to use the generic name of the products they sell. Forfeiture of such an important and valuable right would have been *expressly* stated in the Agreement. In the Agreement, Defendants agreed not to use the word "Salba" or any "Salba"-formative marks. Defendants have ceased using "Salba" or any "Salba"-formative marks. "Salvia" and "Salvia Hispanica" are not "Salba"-formative terms. They are not formed from, based on or derivatives of the SALBA mark, which

---

[2] Salvia is the genus of plants in that includes mint and sage.

13

was first used in commerce on March 16, 2005. Rather, Carl Linneus named the *Salvia* genus and the *Salvia hispanica L.* species nearly 300 years ago. Gentry, H.S., M.Mittleman, and P.R. McCrohan. 1990. *Introduction of chia and gum tragacanth in the U.S..* p. 252-256. In: J. Janick and J.E. Simon (eds.), Advances in new crops. Timber Press, Portland, OR. Exhibit K.

Further underlining the frivolous nature of Plaintiffs' argument, a December 23, 2013 search of Google for the word "Salvia Hispanica" turns up 369,000 results, with pages and pages of third-party websites selling Chia seed products that are listed under the generic product heading "Salvia Hispanica." Exhibit L.

Defendants' use of the generic term "Salvia Hispanica" is does not violate the terms of the Agreement. Again, Plaintiffs are attempting to twist and distort the unambiguous terms of the Agreement to frustrate and delay legitimate competition. Plaintiffs should not be allowed to avoid their duties under the Agreement by claiming rights for which they did not bargain or pay.

## IV. CONCLUSION

As the evidence demonstrates, an unambiguous Agreement was executed on March 7, 2013 and Defendants have performed all of their obligations under the same. However, Plaintiffs failed to dismiss the case on or before October 5, 2013 as jointly stipulated to by the Parties, thereby depriving Defendants the benefit of the final $70,000 settlement payment, while enjoying the benefits of the intellectual property that Defendants assigned, transferred and licensed to Plaintiffs. In an effort to support their actions, Plaintiffs have now filed a completely unsupported – factually or legally -- motion for injunctive relief, as well as a motion to amend the complaint.

Defendants would not have agreed to the settlement had Plaintiffs not agreed to release the final $70,000 payment by July 5, 2013. As a courtesy, the Defendants granted a three-month extension, until October 5, 2013. That date has passed. Now the time has come for the Plaintiffs' to meet their obligations under the Settlement Agreement by dismissing this matter and releasing the final settlement payment.

WHEREFORE, Plaintiff respectfully requests, for good cause shown, that the Court grant this motion and enforce the terms of the Settlement Agreement executed by the parties, and order the following:

1. The Plaintiffs and Defendants to execute and exchange the Settlement of Claims Regarding June 2009 License Agreement attached to the Settlement Agreement as EXHIBIT E;

2. The Plaintiffs and Defendants to execute and file the Stipulated Dismissal with prejudice attached to the Settlement Agreement as EXHIBIT F;

3. Dismissal of the case; and

4. The Plaintiffs to release the remaining payment of $70,000 to the Defendants.

Plaintiff further prays for an award of its fees and costs associated with this Motion, and for such further relief as the Court deems just.

Dated this 23rd day of December, 2013.

    Respectfully submitted,

    /s/Thomas P. Howard
    Thomas P. Howard (Co. Reg. 31684)
    Thomas P. Howard, LLC
    842 W. South Boulder Rd.
    Suite 201
    Louisville, CO  80027
    303-665-9845
    303-665-9847 (Fax)
    thoward@thowardlaw.com

**CERTIFICATE OF SERVICE**

       I hereby certify that on December 23, 2013, a true and correct copy of the foregoing document was presented to the Clerk of Court for filing and uploading to the CM/ECF system, which will send notice to all counsel of record in this matter.

                                                    /s/Melissa Bench
                                                    Melissa Bench