IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 12-cv-01306-REB-KLM

SALBA CORP., N.A., a Canadian corporation,
SALBA SMART NATURALS PRODUCTS, a Colorado limited liability company,
WILLIAM A. RALSTON, and
RICHARD L. RALSTON,

    Plaintiffs,

v.

X FACTOR HOLDINGS, LLC, an inactive Florida limited liability company,
ANCIENT NATURALS, LLC, a Florida limited liability company,
MITCHELL A. PROPSTER, a resident of the State of Florida,
CORE NATURALS, LLC, a Florida limited liability company, and
NATURAL GUIDANCE, LLC, a Florida limited liability company,

    Defendants.
_____

**ORDER**
_____

This matter is before the Court on Plaintiffs' oral **Motion for Spoliation Sanctions** ("the Motion"). The Court held a hearing on the Motion on October 14, 2014 [#144].[1] Pursuant to the Court's instructions, the parties submitted proposed Findings of Fact and Conclusions of Law relating to the Motion [#147, #148]. For the reasons discussed below, the Motion is **GRANTED in part**.

### I. Background and Procedural History

Much of the history to this dispute is set forth in an Award of Arbitrator dated March

---

[1] [#144] is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic filing system (CM/ECF). This convention is used throughout this Order.

1

11, 2010 (Exh. 14)[2], which was confirmed by Order of this Court dated April 21, 2010 (Exh. 15).[3] The Court repeats only those portions of the arbitration award which are necessary to understand the current litigation.

Brothers Alfredo and Adolfo Mealla have cultivated two varieties of chia seed in Peru for more than twenty years. (Exh. 14 at 7). "Salba" is a variety of chia seed that is sold in seed form and used as an ingredient in certain health food products and food supplements. [#147] at 3. In 2003, Plaintiffs William A. and Richard L. Ralston began developing, manufacturing, marketing and distributing "Salba" and food products containing it. (Exh. 14 at 6). In 2006, the Ralstons applied for and obtained United States and foreign trademarks for "Salba Smart and Design" and "Salba Balance" (collectively, the "Marks"). *Id.* at 7. In January of 2007, the Ralstons assigned the Marks to Salba Corp., N.A. ("Salba N.A."), a Canadian corporation, pursuant to an Assignment Agreement. *Id.* In exchange for assigning the Marks, the Ralstons received an exclusive worldwide license to use and sublicense the Marks and to limit Salba N.A.'s use of "Salba" in North America. *Id.*

Plaintiff Salba Smart Naturals Products ("SSNP") is a sublicensee of the Ralstons' rights to the Marks under the Assignment Agreement. As a result of the Assignment Agreement, the Ralstons and SSNP became one of four distributors for Salba products in North America. Defendant Core Naturals LLC ("Core") is another one of the four distributors. *Id.* According to Plaintiffs, Defendant Mitchell Propster ("Mr. Propster") "has

---

[2] "Exh.14" refers to Plaintiffs' hearing exhibit 14, which was admitted into evidence at the hearing held on October 14, 2014. The Court refers to all hearing exhibits by number.

[3] The Order affirming the arbitration award was entered in Civil Action No. 09-cv-02142-CMA-MJW, which was filed in this Court in September of 2009 (the "Arbitration Lawsuit"). The present lawsuit was filed in May of 2012.

2

been and is a member and/or managing member" of Defendants Core, X Factor Holdings, LLC, Ancient Naturals, LLC and Natural Guidance, LLC. [#62] at 3.

In early 2009, at the request of Alfredo Mealla, the Ralstons and SSNP engaged in talks with Core and Mr. Propster about a possible merger of their businesses. During those talks, the Ralstons provided confidential business information to Mr. Propster. By May of 2009, the Ralstons and SSNP had decided against combining their business operations with Mr. Propster's. (Exh. 14 at 10).

Larry and Thelma Brown owned a 5.5% passive ownership interest in Salba N.A.[4] Prior to 2009, Salba N.A. and its licensees apparently used a variety of registered trademarks for the Salba brand seed and food products. [#147] at 3. Beginning in May of 2009, the Browns unilaterally changed Salba N.A.'s website, entered into an unauthorized exclusive License Agreement with Core, and issued a series of communications to Salba N.A.'s distributors alleging – without a bona fide basis – that the Ralstons and SSNP did not have the legal right to use the registered trademarks. The license agreement with Core purported to afford Core exclusive rights to manufacture and sell specific products using the marks "Salba" and "Salba Smart," among others. The Browns, purportedly on behalf of Salba N.A., also issued a series of cease and desist letters to SSNP's internet service

---

[4] A July 17, 2009 letter from the attorney for Salba Corporation, S.A. ("Salba S.A.") to Larry and "Trudy" Brown asserts that Salba S.A.

> is the true and legitimate owner of the Salba and Salba Life trademarks and these trademarks were placed in the name of Salba Corp., N.A. Salba N.A., in turn, was itself placed under your care and in your name solely and exclusively as paid agents and trustees for Salba [S.A.]. Nonetheless, you have recently taken actions claiming ownership of Salba N.A. and the referenced trademarks in contravention of your provable fiduciary obligations to Salba [S.A.].

(Exh. 8).

3

providers and sales outlets, customers, vendors and distributors, threatening them with legal action for dealing with the Ralstons and SSNP and representing that the latter had no legal authority to use the Salba marks. (Exh. 14 at 10-11).

Salba N.A. vigorously contested the Browns' false allegations, and eventually the Mealla brothers sued the Browns and Salba N.A. in Canada. [#147] at 10. On October 1, 2009, the Canadian court issued a preliminary injunction enjoining the Browns from continuing their improper conduct. (Exh. 14. at 10-15). Shortly thereafter, the arbitrator found that the Browns appeared to have obtained the identities of the persons and entities to whom they sent cease and desist letters from Mr. Propster, who got the information from the Ralstons during the earlier merger negotiations. *Id.* at 11. The arbitrator further found that the letters violated the Assignment Agreement. *Id.* at 15. In conclusion, the arbitrator held that Salba N.A. was the owner of record of numerous marks, including "Salba Smart" and "Salba Balance," assigned the marks to the Ralstons, forfeited Salba N.A.'s rights to the marks, and awarded damages to be paid by Salba N.A. to the Ralstons. *Id.* at 15-34. As indicated above, the arbitrator's award was confirmed and made an Order of this Court in April of 2010. The Canadian lawsuit settled in April of 2012. [#147] at 5.

This lawsuit was filed in May of 2012. In this case Plaintiffs contend that since June of 2009 Defendants have continued to advertise, sell, and offer for sale counterfeit non-Salba seed and food products using Plaintiffs' trademarks, trade dress and copyrights. *Id.* Plaintiffs assert claims based on federal and state statutes and common law, including trademark counterfeiting and infringement, unfair competition and false advertising, deceptive trade practices, cyber-squatting, copyright infringement and breach of contract. [#62]. Defendants brought counterclaims for breach of contract, breach of duties of good

faith and fair dealing, copyright infringement, abuse of process, conspiracy, unjust enrichment, misappropriation of business value and civil theft. [#95].

On March 25, 2015, the undersigned recommended that default and default judgment be entered against Defendants Core, Natural Guidance, LLC, X Factor Holdings, LLC and Ancient Naturals, LLC. [#165]. The Recommendation was adopted by the District Judge on April 24, 2015. [#166] The Motion asserts that all Defendants spoliated evidence and that sanctions should enter against each Defendant. In light of the District Judge's Order entering default against Defendants Core, Natural Guidance, LLC, X Factor Holdings, LLC and Ancient Naturals, LLC, the Court addresses the propriety of the relief sought in the Motion as against Mr. Propster, the sole Defendant against whom default has not been entered.

## II. Analysis

"Destruction of evidence, or spoliation, is a discovery offense . . . ." *Gates Rubber Co. v. Bando Chem. Indus. Ltd.*, 167 F.R.D. 90, 101 (D. Colo. 1996). To ensure that discovery as permitted under the Federal Rules of Civil Procedure is not rendered futile, "litigants have a duty to preserve documents that may be relevant to pending or imminent litigation." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 620 (D. Colo. 2007). The court may impose sanctions for the destruction or loss of evidence. *Id.* "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because [he] knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant,* 505 F.3d 1013, 1032 (10th Cir. 2007) (citing *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 989 (10th Cir. 2006)). The movant has the burden of proving, by a

preponderance of the evidence, that the opposing party failed to preserve evidence or destroyed it. *In re Krause*, 367 B.R. 740, 764 (D. Kan. 2007); *see also Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1251 (10th Cir. 2010).[5]

## A. Duty to Preserve Evidence

As noted above, courts in this circuit have held that a party is under an obligation to preserve evidence when litigation is imminent. Plaintiffs assert that Mr. Propster knew or should have known of "an imminent threat of litigation" as early as June of 2009. [#147] at 9. To support that contention, they cite the following evidence:

- Mr. Propster's June 9, 2009 email to Alfredo Mealla claiming surprise at being told that the Marks were not owned by Salba N.A. and stating that he would "do whatever I can that is legally available and keep [Mr. Mealla] posted." (Exh. 1).

- Larry Brown's June 23, 2009 letter to Core claiming that the Marks were owned by Salba N.A. and that Core's use of the Marks was "not licensed" and "unauthorized." (Exh. 2).

- Core's attorney's June 25, 2009 letters to Alfredo Mealla and Salba S.A. stating that Core had complied with the parties' 2008 supply agreement,[6] but that Salba S.A. had breached the agreement

---

[5] The proposed change to Fed. R. Civ. Pro. 37(e) delineating a multi-part test for imposition of spoliation sanctions relating to electronic evidence is under consideration by the United States Supreme Court and has not yet been adopted. *See* Steven S. Gensler, 1 Fed. R. Civ. P., Rules & Commentary Rule 37 ("Proposed amendments to Rule 37(e) are working their way through the rulemaking process and, if they complete the journey, will take effect on December 1, 2015. These amendments would effectively repeal the existing version of Rule 37(e) and replace it with a greatly expanded version that, among other things, would limit severe spoliation sanctions to cases where the spoliator 'acted with the intent to deprive another party of the information's use in the litigation.'").

[6] The record is unclear as to the nature of the contractual relationships between Salba N.A., Salba S.A. and Defendants. As far as the Court has been able to determine, it contains no further explanation of the "2008 supply agreement" allegedly between Salba S.A. and Core, and scant mention of Salba N.A.'s alleged 2009 license agreement with Core. [#148] at 1-2. Neither of these agreements is referenced in Plaintiffs' Amended Complaint. [#62] The lack of explanation of the scope and timing of the business contracts between the parties weakens Plaintiffs' argument that Defendants' knowledge of the imminence of litigation is demonstrated by letters referencing those contracts. The Court has an inadequate basis for assessing the "imminence" of litigation over business contracts without knowing the nature and timing of the legal obligations imposed by those contracts.

6

> because that company had no rights "to the Salba name." The letters further stated that Core "retains the right to demand indemnification from [the company] in the event that Salba Corp., N.A., the owner of the Salba Trademark and its derivatives, seeks to recover any . . . damages arising out of [Core's] use of the Salba Trademarks. In addition, [Core] retains the right to pursue any additional remedies available to it. . . ." (Exhs. 3 and 4).

- Core's attorney's July 1 and July 2, 2009 letters to Salba S.A.'s attorney regarding termination of both the supply agreement and Salba S.A.'s membership in Core.[7] (Exhs. 5 and 6).

- Core's attorney's July 9, 2009 letter to "Mr. Rally Ralston" giving notice of termination of an "Agent-Client Agreement, dated as of April 10, 2009, by and among Core Naturals, LLC, [SSNP] and Creative Innovations, LLC."[8] (Exh. 7).

- Salba S.A.'s attorney's July 17, 2009 letter to Larry and Trudy Brown directing them "not to enter into or to have Salba N.A. enter into any agreement with anyone regarding any aspect of [the Salba and Salba Life] trademarks. These trademarks are not yours or Salba N.A.'s to encumber or in anyway alienate without [Salba S.A.'s] express written permission." The letter was copied to Core and Mr. Propster. (Exh. 8).

- Core's September 10, 2009 press release announcing Salba N.A.'s grant of an exclusive license to distribute Salba® in the United States to Core.[9] (Exh. 9).

- The Meallas' September 2009 lawsuit against Salba N.A. and the Browns in Canada, for which Mr. Propster provided an affidavit dated July 12, 2011 and an affidavit dated September, 2011. (Exhs. 10, 17, 18).

- The fact that Core's attorney also represented Salba N.A. in the arbitration and in the Arbitration Lawsuit. (Exhs. 11, 12, 13).

- The arbitrator's March, 2010 finding that "the 2009 Core Naturals License Agreement was . . . a legally unauthorized and invalid act of [Salba N.A.]." (Exh. 14 at 25).

---

[7] *See supra* note 6.

[8] *See supra* note 6.

[9] *See supra* note 6.

- Core's April 13, 2010 motion to intervene in the Arbitration Lawsuit for the purpose of asserting claims against Salba N.A. and the Ralstons. Case No. 09-cv-02142-CMA-MJW at [#63].

- Core's attorney's June 9, 2010 letter to Integrated Organics Company, LLC demanding that the latter cease and desist from making false representations about the inauthenticity of the Salba product being sold by Core and Ancient Naturals and threatening "immediate litigation."[10]  (Exh. 16)

- Mr. Propster's testimony at the hearing that there was no inconsistency between, on the one hand, his desire in April of 2010 to intervene in the Arbitration Lawsuit due to his concern that his company's rights would be affected by the arbitration award and, on the other hand, his lack of anticipation at that time that he would sue or be sued in connection with the licenses or trademarks. [#146] at 92:24 - 96:5.

Defendants contend that the evidence cited by Plaintiffs to establish that Mr. Propster knew or should have known that litigation was imminent as early as June of 2009 is insufficient for a variety of reasons.  They point out that Exh. 2, Brown's June 23, 2009 letter to Core,

> is the only communication in which Plaintiff Salba Corp., N.A. threatened any of the Defendants with litigation.  The letter . . . demands Defendants license the SALBA trademark from Salba Corp., N.A. or face litigation.  Defendants did in fact license the SALBA trademark from Salba Corp., N.A. and Larry Brown executed the license. [#21-9] p. 7.  Whatever threat of litigation may have existed was eliminated when Defendants complied with the letter and licensed the SALBA trademark from Salba Corp., N.A.

[#148] at 3.   Defendants also contend that there is no evidence that Plaintiffs ever requested that Defendants preserve any documents or that Plaintiffs communicated with Defendants after July of 2009 regarding any licensing disputes, trademark disputes or any other disputes.  *Id.* at 5.

The Court is not persuaded by Defendants' arguments.  Despite Core's admitted

---

[10] The lack of an explanation of the connection, if any, between Integrated Organics Company and Plaintiffs has the same effect indicated in footnote 6, *supra*.

attempted licensing of the Salba trademarks from Salba N.A. on June 10, 2009, it is abundantly clear that the dispute over who owned the Salba trademarks continued for months, that Mr. Propster was aware of the dispute, and that the dispute culminated in an arbitration which directly impacted Defendants' legal rights by concluding that Core's license of the marks was "invalid."  Moreover, Mr. Propster was aware of the arbitration award's impact on Core's legal rights, as is shown by its attempt to intervene in the Arbitration Lawsuit in April of 2010 and as he admitted during his testimony.  As of the date of the arbitration award, March 11, 2010, Mr. Propster should have known that litigation over his companies' use of the Salba trademarks was imminent.  He therefore had a duty to preserve evidence relating to his companies' use of the marks from that point forward.

### B.  Destruction of Relevant Evidence

Plaintiffs have the burden of proving that Mr. Propster destroyed relevant evidence. *Oldenkamp,* 619 F.3d at 1251.  In support of their contention that he did, Plaintiffs assert the following:

- Defendants have produced only 861 documents in this case, 139 of which are duplicative of affidavits and exhibits submitted in the Canadian litigation. Forty of the remaining documents are exact duplicates, "a number of emails were produced without attachments, and a number of documents concerned products unrelated to this case." [#147] at 6.

- Defendants have produced no emails from custodians other than Mr. Propster, including Defendants' employees and contractors, no digital files of label graphics or artwork, and incomplete information relating to orders, invoices, and correspondence with vendors, regulators and customers. *Id.*

- Mr. Propster admitted during his deposition that he destroyed or allowed to be destroyed hard copies of documents and electronic documents on hard drives and backup tapes.  He claims that he disposed of documents during four relocations of his businesses which occurred since 2004, that he had a hard drive failure in 2010 that caused a loss of "orders, customer data, correspondence with vendors, and customers [sic] and various other

company documents," that he deleted unimportant employee files when employees were discharged, and that sometime between 2011 and 2013 he scanned most of the paper documents associated with his business into "servers" but his home was struck by lightning in April of 2014, which damaged his "file server." As a result of the lightning strike, he hired a company to repair the server but efforts to recover documents were not successful. Mr. Propster stated that he "lost all of the data from the hard drives and the backups." He received a bid of $900 to attempt to recover information from the damaged server, but he "did not feel that hiring another recovery service was a good bet and declined to spend any additional money." *Id.* at 7; (Exh. 19 at 109-112, ll. 24-3; Exh. 22).

For their part, Defendants insist that they began to preserve documents "as soon as they were served with the instant lawsuit." [#148] at 6.[11] However, Mr. Propster also admits that he disposed of documents which "probably included orders, invoices, and other correspondence deemed not critical or important to everyday operations" during the "housecleaning" associated with relocations of his office, including a move in December of 2012 and a subsequent move to his current office in Winter Park, Florida. (Exh. 22).[12] He further contends that during these moves, "important files were typically backed up to Defendants' file server." [#148] at 8. He adds that when he let his only employee go in mid-2012, he "preserved all electronic data stored on her computer that was potentially relevant to the instant litigation." *Id.* When he moved his office to his home, he avers that he "hired an independent laborer to preserve approximately 5,000 paper documents by scanning

---

[11] The docket reflects service of the original complaint on Defendants X Factor Holdings, LLC and Ancient Naturals, LLC on May 22, 2012. [#16, #17]

[12] The record contains inconsistent information about the number and dates of post-litigation relocations of Mr. Propster's businesses. In his written memorandum dated July 18, 2014 which was prepared at court direction, he states: "In December of 2012 I moved to an office in Longwood, Florida. . . . My most recent move was from that office to my home in Winter Park, Florida." This document, therefore, refers to two office moves since December of 2012, although it does not provide a date for the most recent move. In Defendants' Proposed Findings of Fact and Conclusions of Law, Defendants state that they were "forced to move to Propster's home office in late 2012 or early 2013." [#148] at 8. This document, therefore, refers to a single office move since December of 2012.

them and saving them to Defendants' file server. After the documents were scanned and saved on Defendants' file server they were shredded." *Id.* Mr. Propster has not offered more specific information about the nature or content of the 5,000 paper documents that he contends were scanned to his server. Unfortunately, all of those documents were lost by the lightning strike which occurred at his home in "late March or early April of 2014." *Id.* at 9.

In addition, Defendants contend that at least some of the documents Plaintiffs are seeking do not exist. Mr. Propster testified at his deposition that he did not receive "an email in which any person appeared to be or in any way expressed or indicated he or she was confused or unsure as to [products with Defendants' labels and products with Plaintiffs' labels]." [#148] at 10. He further testified that he received no "consumer complaints regarding the likelihood of confusion or confusion between [Defendants'] product and anyone else's product." *Id.* at 10-11.

Finally, Defendants point out that the evidence in Plaintiffs' possession relating to consumer complaints is thin, consisting of "three emails suggesting consumer confusion, two of which are of dubious validity, including one from a 'Dr. Perry' in Turkey. Defendants do not sell their products in Turkey." *Id.* at 11. Defendants provide this information to support their argument that additional documents regarding consumer complaints and confusion simply do not exist. *Id.* at 15-16. According to Defendants, "there is no reason for the Court to presume that such communications ever existed." *Id.* at 15-16. Defendants also argue that Plaintiffs could have attempted to obtain documents from other sources, as Defendants provided Plaintiffs with "a complete list of their customers, employees, and vendors," but Plaintiffs failed to "obtain testimony or evidence from any of"

those people. *Id.* at 11.

Identification of documents necessary to prove Plaintiffs' claims and documents which were allegedly spoliated by Defendants is critically important to application of this part of the spoliation test. The law does not require a party to preserve irrelevant documents, and the destruction of such documents could not be the basis for spoliation sanctions, as there would be no "prejudice" to the opposing party as a result. *Burlington N. & Santa Fe Ry. Co.*, 505 F.3d at 1032; *Henning v. Union Pac. R. Co.*, 530 F.3d 1206, 1219 (10th Cir. 2008) (affirming district court's ruling that evidence must be relevant for a spoliation sanction to be imposed). Plaintiffs assert that Defendants have destroyed unspecified email attachments, employees' emails, contractors' emails, digital files of label graphics and artwork, orders, invoices and "correspondence with relevant third parties, including vendors, regulators and customers." [#147] at 6. Importantly, Plaintiffs admit that they lack

> detailed information [about] . . . what documents, both paper and electronic, were destroyed and what efforts were made to recover the missing documents. The Court and Plaintiffs still do not know what computers and hardware components existed before the data destruction or what computers and hardware components were destroyed by each of the claimed data losses.

*Id.* at 7.

Pursuing sanctions for spoliation is difficult, at best, under these circumstances. When a party cannot establish at least the existence of a *type*, if not the exact nature, of documents allegedly destroyed by his opponent, there is a serious risk that he cannot sustain his burden of showing that relevant documents actually existed in the first place. That risk has become reality as to several types of evidence at issue here, including

documents concerning customer complaints of confusion.  Although Plaintiffs contend that Mr. Propster admitted destruction of such documents, his testimony at both his deposition and the hearing demonstrates otherwise.

> Q: (By Mr. Brenner) Mr. Propster, have you received any consumer complaints regarding the likelihood of confusion or confusion between your product and anyone else's product?
>
> A: Not to my recollection.
>
> Q: Have you received any phone calls to that effect?
>
> A: No.
>
> Q: Have you received any emails to that effect?
>
> A: No.
>
> Q: If you'd received any emails would you have produced them?
>
> A: Yes.
>
> . . .
>
> Q: (By Mr. Gurr) So Mr. Propster, getting back to Exhibit 20, Page 48 at the top. I'll read my question if you'd please read your answer.  My question was has Ancient Naturals ever received any communication from any party who appeared to be confused, misled, or in any way unsure as to the difference between Salvia hispanica labeled products and Salba labeled products?
>
> A: Yes.
>
> Q: And what was your answer?
>
> A: Not to the best of my knowledge, but somebody I suppose could have called or asked.
>
> Q: And to whom would they have spoken had they called?
>
> A: If they called for Ancient Naturals they would have probably spoken to me or I would have taken the call in any case.
>
> Q: And what records, if any, did Ancient Naturals make of such

        communications?

A:    *None. We wouldn't have kept those communications.*

Q:    Why not?

A:    But [sic] we didn't feel it was important to do so.

Q:    Did any of the other Propster entities maintain records of such communications?

A:    *No.*

[#146] at 105, ll. 5-15; 120, ll. 1-23 (emphasis added). This testimony does not establish that Mr. Propster destroyed records of customer complaints about confusion; it establishes that although he may or may not have received phone calls regarding customer confusion, he never made any record of them. Plaintiffs have cited no authority, and the Court is aware of none, which holds that a party has an obligation to make written records relating to relevant events when he knows or should know that litigation is imminent. *See, e.g., Geiger v. Z-Ultimate Self Defense Studios, LLC*, No. 14-cv-00240-REB-BNB, 2014 WL 6065612, at *13-14 (D. Colo. Nov. 12, 2014) (holding Rule 34 "requires a party to produce responsive documents in its possession, custody and control. It does not contemplate that a responding party will create new documents responsive to the request."). Thus, Plaintiffs have failed to carry their burden of establishing that Defendants destroyed evidence relating to customer confusion. *Oldenkamp*, 619 F.3d at 1251.

      As mentioned above, Plaintiffs also contend that Defendants destroyed other evidence, like employees' emails, contractors' emails, digital files of label graphics and artwork, orders, invoices and correspondence. Yet the only evidence regarding the existence of any of these documents appears to be Mr. Propster's July 18, 2014

memorandum explaining that "orders, customer data, correspondence with vendors, and customers [sic] and various other company documents" were lost as a result of a hard drive failure that occurred in "early 2010," and that he "deleted the files [he] felt were no longer critical or important" from employees' computers when he "cut back" on staff. (Exh. 22). Plaintiffs point to no other evidence regarding the content of the lost or destroyed "email attachments," "correspondence with vendors," "correspondence with customers," "employee emails" and "various other company documents." "This is a naked invitation for the Court to speculate . . . that what is missing might be of evidentiary value." *Oldenkamp*, 691 F.3d at 1251. The Court may not so speculate, and therefore cannot conclude that spoliation occurred with respect to these categories of documents. Moreover, in light of the Court's finding that Mr. Propster's duty to preserve evidence arose when the arbitration award was issued in March of 2010, it is not clear that the hard drive loss which he describes as having occurred in "early 2010" constitutes a failure to preserve relevant evidence.

The remaining missing documents, according to Plaintiffs, are contractors' emails, digital files of label graphics and artwork, orders and invoices. Plaintiffs have failed to carry their burden of proving that contractors' emails and digital files of label graphics and artwork ever existed. As explained above, it is not sufficient to assume that because such documents are routinely created by American companies who conduct the type of retail sales involved here, they must have existed in Defendants' electronic and paper records. That assumption asks the Court to speculate that something of evidentiary value is missing, and such speculation is improper. *Id.*

However, there is no dispute that Plaintiffs specifically requested "invoices, purchase

15

orders, cancelled checks, wire transfers and/or credit memoranda" in written discovery to Defendants. *See, e.g.*, [#148-1] at 17. Furthermore, Mr. Propster has conceded that some customer orders and invoices were lost, although he asserts that he provided Plaintiffs with "a complete list of [Defendants'] customers, employees and vendors," and that "plaintiffs did not depose or otherwise attempt to obtain testimony or evidence" from these individuals. [#148] at 11.

The difficulties with Plaintiffs' assertion regarding destruction of documents that could demonstrate revenue received by Defendants, like customer orders and invoices, arise both from the date of the initial "loss" of this information and from the nature of the document destruction that subsequently occurred. Mr. Propster alleges that the initial loss of this data resulted from the "hard drive failure" his businesses experienced "in early 2010." (Exh. 22). He explains that Defendants "were able to use paper copies of some orders and purchase transactions and compile those into our financial system. For the most part, however, documents and data prior to 2010 were not recovered." In addition, documents on the "tape backup system" he then decided to use were destroyed by the lightning strike in April of 2014. *Id.* Thus, Plaintiffs have difficulty in establishing that *Defendants* destroyed documents *after their duty to preserve arose.*

But Mr. Propster's explanation of his document retention efforts has problems too. He admits that when he moved to his home office "in late 2012 or early 2013, [he] hired an independent laborer to preserve approximately 5,000 paper documents by scanning them and saving them to Defendants' file server. After the documents were scanned and saved on the file server they were shredded." [#148] at 8. Hence, more than two years after his duty to preserve documents arose, he relied exclusively on electronic means of preserving

16

them and purposefully destroyed hard copies. He did so despite experiencing a "hard drive failure" that caused him to lose business documents in early 2010. (Exh. 22). The bottom line, therefore, is that the initial "loss" most likely included documents which Defendants had no duty to preserve, and although the subsequent "loss" was primarily due to an act of nature, Mr. Propster's conduct in failing to preserve hard copies of electronic records was, at the least, negligent. Hence, Plaintiffs have demonstrated that orders and invoices were spoliated.

**C. Prejudice Resulting from Destruction of Relevant Evidence**

With respect to Plaintiffs' trademark infringement claim, Plaintiffs have the burden of proving both actual damages and lost profits from Defendants' alleged sales of counterfeit products and/or trademark infringement. 15 U.S.C. §1117(a) explicitly requires Plaintiffs to prove "defendant's sales only; defendant must prove all elements of cost or deduction claimed." In light of this burden, spoliation of evidence relating to Defendants' sales, including orders and invoices, has caused prejudice to Plaintiffs. Moreover, "recovery under section 1117 is not limited to cases in which the quantum of actual damages is demonstrated. Rather, plaintiffs may recover profits reaped by the defendants from their infringing activity." *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985); *see also Estate of Bishop v. Equinox Int'l Corp.*, 256 F.3d 1050, 1054 (10th Cir. 2001) (discussing an award of an infringing defendant's profits to an injured plaintiff under 15 U.S.C. § 1117(a)). Because "profit is determined by deducting all expenses from gross revenues," destruction of information regarding orders and invoices affects proof of gross revenues, and may accordingly affect proof of Defendants' profits as well. Model Civ. Jury Instr. 9th Cir. 15.26 (2007). Hence, spoliation of Defendants' orders

and invoices has also prejudiced Plaintiffs regarding proof of Defendants' profits.

**D. Spoliation Sanctions**

Plaintiffs seek a smorgasbord of sanctions due to Defendants' spoliation. More specifically, they ask the Court to dismiss Defendants' counterclaims with prejudice,[13] to bar Defendants from introducing certain evidence at trial, to instruct the jury not only that the destroyed evidence would have been unfavorable and adverse to Defendants' case but also that such evidence would have established (1) a likelihood of confusion, (2) the invalidity of Defendants' alleged 2009 license agreement, (3) Defendants' breach of the settlement agreement, and (4) the validity and ownership of Plaintiffs' Salba marks. Plaintiffs also seek an award of their costs and fees incurred as a result of the Motion for Sanctions. [#147] at 26-27.

Putting aside the question of whether jury instructions about the invalidity of Defendants' purported 2009 license agreement and the validity of Plaintiffs' Salba marks are necessary in light of this Court's affirmation of the arbitrator's award, it is apparent that an adverse inference instruction is not warranted here. "If the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith." *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009). "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a bad case." *Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1407 (10th Cir. 1997). Plaintiffs have shown that Defendants lost evidence relating to damages, but they have not shown that Defendants did so intentionally. In fact, it is undisputed that the

---

[13] The District Judge has entered an Order dismissing Defendants' counterclaims for failure to prosecute, for failure to comply with court orders, and for lack of counsel. [# 166]. Hence, this request is moot.

loss of this evidence ultimately occurred as a result of computer failure and a lightning strike. The evidence is also undisputed that Mr. Propster made some effort to recover the documents affected by the lightning strike by hiring a third party to rebuild the server. (Exh. 22). The fact that this attempt was unsuccessful does not make his efforts unreasonable or demonstrate bad faith.

In light of these findings, the sanctions proposed by Plaintiffs are too harsh. At best, Plaintiffs have demonstrated that Defendants lost relevant evidence of damages and that the loss is prejudicial, but the degree of prejudice is unclear. Although proof of Plaintiffs' damages for trademark infringement could be derived from Defendants' sales orders and invoices, Plaintiffs' damages could also be demonstrated by Defendants' profit and loss statements, Defendants' tax returns, testimony of Mr. Propster, testimony of Defendants' former employees and contractors (if any), and testimony of Defendants' financial personnel, such as an accountant (if any). *See, e.g.*, *Louis Vuitton S.A.*, 765 F.2d at 973 (discussing the use of testimony to calculate damages in a trademark infringement case); *Competition Specialties, Inc. v. Competition Specialties, Inc.*, 87 F. App'x 38, 43 (9th Cir. 2004) (using tax returns as evidence of damages in trademark infringement case); *Choice Hotels Int'l, Inc. v. Pennave Assocs., Inc.*, 43 F. App'x 517, 518 (3d Cir. 2002) (discussing records of profits and losses in connection with a trademark infringement claim). Plaintiffs have made no showing of their inability to obtain other evidence which could substitute for the missing sales orders and invoices. In essence, the spoliation which occurred here prevented Plaintiffs from obtaining some convenient evidence of damages, but not all such evidence. Moreover, Plaintiffs have made no showing of the relevance of this evidence to any claim other than the trademark infringement claim. Under these circumstances, a

lesser sanction is appropriate.

### III. Conclusion

For the reasons discussed above, the Motion is **granted in part**, as follows:

IT IS HEREBY **ORDERED** that due to spoliation of evidence relating to customer orders and invoices, Defendant Mitchell Propster shall be precluded from introducing evidence of any business expenses incurred and losses sustained by Defendants X Factor Holdings, LLC, Ancient Naturals, LLC, Core Naturals, LLC and/or Natural Guidance, LLC related to sales of chia seed products from March 10, 2010 through the date of trial.

IT IS FURTHER **ORDERED** that Plaintiffs are awarded their costs and reasonable attorneys' fees incurred in connection with the Motion. Plaintiffs shall file an affidavit or affidavits and supporting information under D.C.COLO.LCivR 54.3 **on or before May 15, 2015.**

Dated: April 30, 2015

BY THE COURT:

*Kristen L. Mix*

Kristen L. Mix
United States Magistrate Judge